# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR-18-29-GF-BMM |
| Plaintiff, | |
| vs. | |
| | **ORDER** |
| ROEL CENTENO and CAROLINA CHRISTINA RAMIREZ, | |
| Defendants. | |

Defendants Roel Centeno and Carolina Christina Ramirez (collectively "Defendants") separately move this Court to suppress evidence obtained subsequent to a warrantless search of two hotel rooms at the Extended Stay Hotel ("Extended Stay") in Great Falls, Montana. (Docs. 79, 86.) Ramirez further moves this Court to sever her case from that of her codefendant Centeno's. (Doc. 82.) The Court conducted a hearing on the instant motions on January 23, 2019. (Doc. 95.)

## BACKGROUND

Extended Stay staff shared concerns of "suspicious activity" that occurred in relation to Michael Laird's sojourn at the Extended Stay. (Doc. 96 at 10-12.) Jillian Arnold, a manager at the Extended Stay, and one of the front desk clerks informed

Mike Sadowsky of their collective observations. *Id*. at 11-12. Sadowsky serves as a maintenance engineer at the Extended Stay. *Id*. at 8.

Laird rented two adjoining rooms—225 and 227—from February 28, 2018, to March 3, 2018. (Docs. 87 at 2, 94 at 15.) Laird used a temporary Wells Fargo card to rent both rooms. (Doc. 94 at 5-6.) Laird checked into the Extended Stay using a California driver's license. (Doc. 93.) Two vehicles were connected with the rooms—a white Cadillac with Montana plates and a white Nissan with California plates. (Doc. 94 at 5.) Hotel employees relayed to Sadowsky that only Laird occupied room 225—a room with two beds. (Doc. 96 at 13.) Ramirez, a guest of Laird's, occupied room 227. *Id*. at 13-14. Though, neither hotel staff, nor Sadowsky, observed anybody "coming out of 227" during the course of Laird's stay. *Id*. at 13.

Sadowsky determined that the personal observations of the hotel staff warranted a check on room 227. *Id*. Sadowsky devised a plan to enter room 227 under the guise of needing to clean the smoke detector. *Id*. at 15. Shortly before 10:00 a.m. on March 2, 2018, Sadowsky knocked on room 227's door as Arnold said "management." (Docs. 95 at 2, 96 at 14.) Ramirez responded with either "hang on" or "just a second." (Doc. 96 at 14.)

Ramirez opened the door an estimated thirty to forty-five seconds later with a comforter wrapped around her shoulders. *Id*. at 14, 15. Sadowsky presumed that

Ramirez was undressed under the comforter. (Docs. 96 at 15, 93.) Sadowsky further noted that Ramirez looked "younger" though Sadowsky was unable to tell her age. (Doc. 96 at 17.) Ramirez allowed Sadowsky to enter room 227 to clean the smoke detector. *See id.* at 15.

Sadowsky, once inside the room, climbed up a ladder to clean the smoke detector. (Doc. 96 at 15.) From this vantage point, Sadowsky observed "one small package of noodles . . . sitting on top of the refrigerator" and a "Victoria's Secret bag" in the room. *Id*. at 16. Sadowsky observed no other personal belongings. *Id*. Ramirez made a phone call while Sadowsky cleaned the smoke detector. *Id*. at 17. Sadowsky recounted that Ramirez spoke Spanish, and that Ramirez sounded "nervous" and "startled." (Docs. 93, 96 at 16, 123.)

Sadowsky also investigated the two vehicles connected with rooms 225 and 227. (Doc. 94 at 5.) Sadowsky walked outside the parking lot to write down the license plate numbers of both vehicles. (Docs. 94 at 5, 96 at 20.) Sadowsky aborted the investigation, however, when he observed room 225's guest, whom he believed to be Laird, "pacing nervously" and watching Sadowsky from the room. (Docs. 94 at 5, 96 at 20-21.)

The Great Falls Police Department ("GFPD") received a 911 call from Arnold and Sadowsky on March 2, 2018, at approximately 10:10 a.m. (Docs. 93, 95.) The following is an uncertified transcript of the 911 call:

Dispatch:       Police Dispatch.

Arnold:         Hi, this is Jillian Arnold calling from the Extended Stay
                here in Great Falls. I just had well I'm wondering if we can get
                an unmarked car here I just need to file a report with a police
                officer.

Dispatch:       Uh, what kind of report?

Arnold:         It's suspicious activity in our hotel.

Dispatcher:     Going on right now?

Arnold:         (intelligible)

Sadowsky:       Hello?

Dispatcher:     So, what's going on?

Sadowsky:       Well, we've got people registered from California here and
                we've got one guy that's in a room with two beds by
                himself and then we found out that he has a second room that
                he's using, and we've not seen anybody for two days come in
                or out of that room. So, I used the excuse that I had to go in and
                check the smoke detector to enter into that room. When I
                entered that room, there was just a female by herself. She has
                no luggage that I could see. She was undressed and had to have
                a comforter wrapped around her. She has no belongings, except
                for a couple of Victoria Secret bags in the room. And she was
                really nervous and when I was in there cleaning it and trying to
                look from the ladder and see if there was anything else in
                there, she got on the phone and was speaking in Spanish I think
                she was contacting the guy from the other room. We've got to
                cars out here – one from California and one from Montana and
                I've got plate numbers. I thought maybe we can get those to the
                officers. We're afraid that if like a regular patrol car comes here
                we're going to…

Dispatcher:     Okay, well we don't have any unmarked vehicles that can
                come take a report from you, like, they would need to…

4

Sadowsky: Okay. Could he park…could he park at our side entrance? They're from California and we're just worried about some kind of violent thing going on if they…

Dispatcher: And you said you're at the Extended Stay?

Sadowsky: Yeah, and it might be nothing, but you find a young girl in a room with no clothes and just wrapped in a comforter…no belongings…

Dispatcher: What's the address there?

Sadowsky: 800 River Drive South.

Dispatcher: What room is she staying in?

Sadowsky: She is in 227 and he is in 225. It's just either some kind of drug trafficking or human trafficking. She looks…and I couldn't tell her age, but she looked fairly young. Zero personal items except for Victoria Secret bags. We're just afraid to set them off with a patrol car in our parking lot.

Dispatcher: Are you going to be at the front desk or anything to meet an officer?

Sadowsky: Yeah, but we prefer to talk to him in a different room, not right here in the lobby. The guy comes down through the lobby quite often. And he is the only one that comes down. The girl has never been down or out of the room.

Dispatcher: What's that male's name?

Sadowsky: The male's name? What is it? (intelligible off phone conversation with Arnold) Michael Laird L-A-I-R-D. He has California license with a Montana plate car. A Cadillac.

Dispatcher: And can I get your name?

Sadowsky: My name is Mike.

Dispatcher:  Last name?

Sadowsky:  Sadowsky S-a-d-o-w-s-k-y.

Dispatcher:  And a phone number for you.

Sadowsky:  [redacted]

Dispatcher:  Alrighty.

Sadowsky:  (intelligible off phone conversation with Arnold)

Dispatcher:  We'll get a couple of officers to come talk to you guys and see if we can check her out.

Sadowsky:  Okay, well yeah hopefully it doesn't set them off because they're watching out the window, too. When I went out to look at the cars, he was just frantically looking at me through the window. Like bobbing and kind of dodging. I don't know the whole thing seems suspicious.  I've worked…I've been in motels for 12 years, 13 years so. It may be an innocent nothing but you never know. I don't want to see something happen.

Dispatcher:  Alrighty. Yep, we will get someone to get over there to come talk to you.

Sadowsky:  Sounds good.

Arnold:  Thank you.

Dispatcher:  Yep, you're welcome.

Sadowsky:  Thank you very much.

Dispatcher:  mmhm. Goodbye.

(Doc. 93.)

Sergeant Rich Labard, while he was on patrol on March 2, 2018, viewed the following notes transcribed by the GFPD dispatcher who fielded the 911 call:

| | |
|---|---|
| 10:11:46 | HAS 2ND ROOM REGISTERED TO HIM AS WELL |
| 10:12:13 | FEMALE WAS IN THE ROOM UNDRESSED WITH A COMFORTER WRAPPED AROUND HER ALL BY HERSELF |
| 10:12:25 | LOOKS VERY NERVOUS |
| 10:12:35 | FEMALE SPEAKS SPANISH |
| 10:13:40 | CP WOULD LIKE WELFARE CHECK DONE ON FEMALE |
| 10:14:00 | NO PERSONAL ITEMS IN THE ROOM WITH FEMALE AT ALL – JUST WRAPPED IN COMFORTER |
| 10:14:25 | CP WOULD LIKE OFFICERS TO PARK ON THIS SIDE |
| 10:14:47 | MICHAEL LAIRD IS WHO THE ROOM IS REGISTERED TO |
| 10:15:07 | THINK ITS SUSPICIOUS AND MIGHT BE HUMAN TRAFFICKING |
| 10:16:15 | CP WILL MEET OFFICERS SO HE CAN SPEAK WITH THEM BEFORE TRYING TO MAKING CONTACT WITH FEMAKE (sic) |
| 10:16:52 | SAYS MALE KEEPS AN EYE OUT AND THINKS OFFICERS MIGHT SPOOK THEM |

(Docs. 95 at 2-3, 96 at 78.)

A few things "jumped out at [Sergeant Labard] . . . about the call." (Doc. 96 at 78.) First, the call concerned a hotel. (Doc. 96 at 78.) Second, "there was a

report of a female who was nude by herself in a room wrapped in a blanket." *Id.*

Third, there were no personal items in the hotel room. *Id.* at 78-79. Fourth, there

was a second room related to the room where Ramirez was staying. *Id.* at 79. And,

finally, "there was a male that . . . appeared to be keeping watch." *Id.*

Sergeant Labard determined that the 911 call notes supported Sadowsky's

suspicion that Ramirez might be a victim of human trafficking. *Id.* at 81. Sergeant

Labard contacted dispatch to have them refrain from sending uniformed officers to

the Extended Stay. *Id.* at 84. Sergeant Labard immediately traveled back to the

station and "met face-to-face with Detective [Jesse] Slaughter." *Id.* Detective

Slaughter, at the time, was employed as an Internet Crimes Against Children

detective with the GFPD. *Id.* at 92. Sergeant Labard had Detective Slaughter

"bring up the call on his own computer." *Id.* Sergeant Labard described to

Detective Slaughter what Sergeant Labard thought he was seeing on the computer.

*Id.* at 86. Sergeant Labard then "turned over the whole operation to [Detective

Slaughter]" *Id.*

Detective Slaughter contacted Sadowsky after his meeting with Sergeant

Labard. *Id.* at 101. Detective Slaughter "needed more intel to determine how we

were going to address the situation, and [he] needed to discover more information

about what [they] had." *Id.* Sadowsky largely recited the same information that he

had relayed to dispatch during the 911 call. *Id.* at 101-104. Sadowsky further

informed Detective Slaughter that he had witnessed the guest, "who he believed to be [Laird,] . . . watch him from the window very suspiciously." *Id.* at 101. Sadowsky told Detective Slaughter that Laird had rented the rooms on a temporary Wells Fargo credit card. *Id.* at 102. Sadowsky also noted that Laird had "asked if he could smoke in the room" when the room was non-smoking. *Id.* at 103.

Detective Slaughter "assembled . . . a team of kind of a mix of uniformed officers and undercover, basically, plain clothes . . . investigators and officers" to attempt to rescue "what [they] believed at the time to be a child" in room 227. *Id.* at 108. Detective Slaughter planned to have "the area surrounded" by his team of uniformed officers to prevent someone from fleeing. *Id.* at 109. The plain clothes officers would "initiate any type of contact at the doors" in an effort to "prevent the victim from fleeing and also to possibly slow down the trafficker being alerted to [law enforcement's] presence." *Id.*

Detective Slaughter arrived at the Extended Stay at 11:36 a.m.— approximately one hour and twenty-five minutes after Arnold and Sadowsky had initiated the 911 call. (Docs. 95 at 3, 96 at 110-11.) Detective Slaughter went to the front desk to obtain the master hotel key. (Doc. 96 at 112.) Detective Slaughter, Detective Burrows, and Agent Flynn entered room 227 using the hotel key card as planned. *Id.* at 112-13.

Detective Slaughter searched the empty room for Ramirez without success—looking under the bed and in the closet. (Docs. 94 at 7, 96 at 114.) Detective Slaughter observed the lingerie packages that matched the ones that Sadowsky had observed while cleaning the smoke detector. (Doc. 96 at 114.) Detective Slaughter and his team searched the room for any item to identify Ramirez. *Id.* The officers found only a large amount of cash in a plastic bag inside Ramirez's purse hanging in the room's closet. (Docs. 94 at 7, 96 at 114.) Detective Slaughter notified other officers at approximately 12:07 p.m. that Ramirez was "not inside the room" and to "keep [an] eye on the other room." (Doc. 95 at 3.)

Detective Slaughter left room 227 and walked immediately to the other room that Laird had rented—room 225. (Doc. 96 at 115.) Detective Slaughter knocked on room 225's door and announced "maintenance." *Id*. at 116. Detective Slaughter explained that he elected to knock on room 225's door because he felt that knocking would "get the tracker and possibly the victim separated." *Id*. Centeno answered the door. *Id*. Detective Slaughter and Agent Flynn grabbed Centeno and escorted him across the hall into an open room. *Id*. at 117. The remaining law enforcement officers searched room 225 for Ramirez. *Id*. The officers did not find Ramirez. *Id*. The officers did observe firearms under the bed. *Id*.

Detective Slaughter was in room 225 when he heard the door open to room 227. *Id*. at 118. Detective Slaughter knocked on room 227's door and announced

himself. *Id*. Detective Slaughter knocked and announced himself because, at that point, he knew that no one was "possibly being sexually victimized" in room 227. *Id*. Detective Slaughter saw Ramirez inside room 227. *Id*. Ramirez provided Detective Slaughter with identification upon his request. *Id*. Ramirez possessed two differing forms of identification. *Id*. Detective Slaughter, at that point, still "believed [Ramirez] was the victim" of sex trafficking, especially given her "reluctance to speak with [Detective Slaughter]." *Id*. at 119. Detective Slaughter ultimately concluded that "further investigation was necessary and that [law enforcement officers] would need to secure [rooms 225 and 227] and that [Detective Slaughter] would obtain search warrants for those rooms." *Id*.

Centeno remained with Agent Kinsey while Detective Slaughter and the other officers searched room 225. *Id*. at 120. Agent Kinsey observed that Centeno's arms contained numerous tattoos. (Doc. 80-3 at 2.) Agent Kinsey believed that some of Centeno's tattoos looked like prison tattoos. *Id*. Agent Kinsey inquired into Centeno's criminal history. *Id*. Centeno confirmed that he previously had been imprisoned in California. *Id*.

Agent Kinsey read Centeno his *Miranda* warning. *Id*. Centeno agreed to speak to Agent Kinsey and signed a waiver of his rights. *Id*. Centeno explained to Agent Kinsey that he had travelled from California to Montana to visit his daughter in Havre. *Id*. at 2-3. Centeno stated that his friend Laird had rented the room. *Id*. at

3. Centeno informed Agent Kinsey that he would find several guns and ammunition in room 225. *Id*. at 3-4. Centeno further informed Agent Kinsey that he would find crystal methamphetamine in a beanie behind the dresser. *Id*. at 4. Centeno explained that the methamphetamine belonged to Laird. *Id*. Centeno admitted that he knew that Laird was known for distributing drugs. *Id*. Centeno further stated that he had never witnessed Ramirez use drugs, but Centeno believed that Ramirez was involved in dealing drugs with Laird. *Id*. at 5. Centeno provided further information about the 2016 Nissan connected with rooms 225 and 227. *Id*.

Agent Kinsey read Ramirez her *Miranda* warning after Agent Kinsey had finished his interview with Centeno. *Id*. at 6. Ramirez refused to answer Agent Kinsey's questions and requested counsel. *Id*. Ramirez and Centeno subsequently were transported to the GFPD. *Id*.

Detective Slaughter applied for four search warrants on March 2, 2018, largely based on the information that Sadowsky had supplied to Detective Slaughter, the information from the 911 call, and Detective Slaughter's observations while investigating rooms 225 and 227. *See* (Docs. 94-1, 94-2, 94-3, 94-4.) Montana Eighth Judicial District Court, Cascade County, Judge John Kutzman issued the four search warrants on March 2, 2018, between 3:44 p.m. and 3:50 p.m. *Id*. The warrants authorized the search of room 225, the search of room

227, the search of the white 2002 Cadillac Deville, and the search of the white 2016 Nissan Altima. *Id*.

Law enforcement executed the search warrant on room 225 at 4:28 p.m. on March 2, 2018. (Doc. 94-1 at 16.) Law enforcement seized, in pertinent part, eight guns, several rounds of ammunition, 4,596.5 grams of actual methamphetamine, numerous cell phones, ledgers, scales, $3,862.69 in cash, and 181.3 grams of noscapine. *Id*. at 16-17. Officers executed the search warrant on room 227 at 4:25 p.m. (Doc. 94-2 at 16.) Officers seized $31,500 in cash and two cell phones. *Id*. The search of the 2016 Nissan revealed drug packaging stored in the non-factory compartment on the car. (Doc. 94-4 at 17.) Officers further seized two cell phones. *Id*. The search of the 2002 Cadillac resulted in officers seizing a firearm magazine, ammunition, and a gun sling. (Doc. 94-3 at 17.)

## DISCUSSION

### I.     Motions to Suppress

Defendants contend that the warrantless searches of rooms 225 and 227 prove unconstitutional. (Docs. 80 at 11, 87 at 10.) Ramirez further claims that law enforcement did not possess probable cause to arrest her. (Doc. 80 at 8.) Ramirez likewise contends that law enforcement possessed no legal basis to impound her car while Detective Slaughter worked to obtain a search warrant. *Id*. at 10. Defendants ultimately argue that all of the seized evidence must be suppressed as

the officers justified the search warrants based on fruit of the poisonous tree—the warrantless searches of rooms 225 and 227. (Docs. 80 at 11, 87 at 15.)

### A.  Warrantless Searches of Rooms 225 and 227

The Government contends that the exigent circumstances and the emergency aid warrant exceptions justified the warrantless searches of rooms 225 and 227. (Doc. 94 at 15.) The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The touchstone of the Fourth Amendment is "reasonableness." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citations omitted). Searches conducted absent a warrant prove per se unreasonable. *Id.* (citations omitted). The warrant requirement remains subject, nevertheless, to certain exceptions. *Id.* (citing *Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (*per curiam*); *Katz v. United States*, 289 U.S. 347, 357 (1967)). "There are two general exceptions to the warrant requirement for home searches: exigency and emergency." *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005). The Court will assess whether either of these warrant exceptions applies to the case at bar.

### 1.  Emergency Aid Exception

"The need to protect or preserve life or avoid serious injury" justifies what otherwise would be unconstitutional absent an exigency or an emergency. *Mincey*

*v. Arizona*, 437 U.S. 385, 392 (1978) (citation omitted). Law enforcement officers invoke the emergency aid exception when the officer possesses "an objectively reasonable basis for believing . . . that a person within [the house] is in need of immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (internal quotations and citations omitted). "Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." *Id.* at 49 (internal quotations omitted).

The emergency aid exception nevertheless remains "narrow and rigorously guarded." *Bonivert v. City of Clarkson*, 883 F.3d 865, 877 (9th Cir. 2018) (internal quotes omitted). Officers "bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984). The Ninth Circuit has adopted "a two-prong test that asks whether: (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2007).

The officers in *Snipe* responded to a 911 call demanding that the cops get to the residence of Dennis Snipe right now. 515 F.3d at 949. The officers arrived at the residence and knocked the partially ajar door open as the officers announced,

"Fort Hall Police Department." *Snipe*, 515 F.3d at 949. The officers entered the residence and noticed several people at a table. *Id.* The officers explained that they "had received a call from a 'hysterical male.'" *Id.* The officers noticed a large quantity of drugs on the table while the officers were talking to the occupants of the house. *Id.*

The Ninth Circuit reasoned that these factors satisfied the totality of the circumstances: (1) the "officers knew that they were responding to an emergency call by a 'hysterical male' who instructed the dispatcher to '[g]et the police over here now;'" (2) "it was objectively reasonable to believe the caller had an emergency, even though the call did not come in on the department's 911 system," and (3) "the call came in at 5 A.M." *Id.* at 953. The Ninth Circuit further determined that the entry had been reasonable. *Id.* at 954. The officers "knocked and announced their presence before entering the residence" and "identified themselves and said they were responding to an emergency call" once they entered the home. *Id.*

The scenario that law enforcement faced in *Snipe* differs from the scenario here. Arnold called 911 to request an officer to the Extended Stay as Arnold wished to make a report of suspicious activity. (Doc. 93.) The dispatcher informed Sadowsky that she would send a couple of law enforcement officers to the Extended Stay to conduct a welfare check on Ramirez. *Id.* Neither Sadowsky nor

Arnold exclaimed that their suspicions rose to the level of an emergency situation. *See id*. Sadowsky and Arnold likewise did not request that an officer report immediately to the Extended Stay. *See id*. Sadowsky or Arnold, in the 911 call, also did not report that there had been any complaints of violence associated with rooms 225 and 227 on or before March 2, 2018. *See* (Docs. 93, 96 at 30.)

Sadowsky knocked on room 227's door shortly before 10:00 a.m. on March 2, 2018. *See* (Doc. 95 at 2.) Ramirez answered the door with a comforter wrapped around her shoulders. (Doc. 96 at 15.) Sadowsky was unable to determine fully, however, whether Ramirez was clothed or unclothed under the comforter. *Id*. Sadowsky reported that Ramirez used her cell phone to call another person while Sadowsky was in room 227. *Id*. at 17. Sadowsky ultimately agreed that the "fact of her having a cell phone" meant that "she could have been free to leave or to call whom she wanted." *Id*. at 50. Sadowsky further stated that he saw only a "small package of noodles" and a "Victoria's Secret bag" in room 227. *Id*. at 16. Sadowsky admitted that his vantage point precluded him from observing personal items that may have been located in the bathroom, the dresser, or the closet. *Id*. at 16, 41.

Sadowsky reported that Ramirez seemed nervous. *Id*. at 16. Sadowsky did not report that Ramirez showed signs of distress, or that she otherwise appeared to be in immediate danger. And, most notably, the fact that law enforcement took

approximately an hour and twenty-five minutes after having received the 911 call to respond to the Extended Stay undermines any claim that Ramirez was in need of immediate protection. (Doc. 95 at 3.) The totality of these circumstances fails to support a reasonable basis for law enforcement to conclude that Ramirez stood in immediate need of protection. *See Snipe*, 515 F.3d at 953.

Even if it had been reasonable for law enforcement to conclude that Ramirez stood in immediate need of protection, the scope and manner of the warrantless search proved unreasonable in light of the circumstances. Law enforcement surrounded the Extended Stay to prevent a suspect or the victim from escaping. (Doc. 96 at 109.) Detective Slaughter used a master key card to enter room 227. *Id.* at 112-13. Detective Slaughter did not announce himself as law enforcement before entering room 227. *Id.* at 113. Upon discovering that Ramirez no longer was in room 227, Detective Slaughter expanded the warrantless search to room 225. *Id.* at 114-15. Detective Slaughter, again, failed to announce himself as law enforcement. *Id.* at 116. Detective Slaughter instead knocked on the door and announce "maintenance." *Id.*

Detective Slaughter testified that he elected not to knock and announce himself before entering room 227. *Id.* at 98. He explained that doing so may have alerted the victim to "flee the situation" out of fear of "punishment which the victim could receive [for] cooperating with law enforcement . . ." *Id.* Detective

Slaughter changed course, however, as he proceeded to knock on room 225's door before entering. *Id*. at 116. Detective Slaughter explained that knocking on 225's door likely would "get the tracker and possibly the victim separated." *Id*. Detective Slaughter finally testified that he again chose to knock and announce himself upon his return to room 227's door before entering. *Id*. at 118. He testified that he knew, at that point, that no one was "possibly being sexually victimized" in room 227. *Id*.

Furthermore, Detective Slaughter, unlike the officers in *Snipe*, failed to explain that he was responding to a 911 call related to those two rooms upon his initial entrances into rooms 225 and 227. Detective Slaughter, after entering room 227 for the second time, did explain to Ramirez that he "didn't believe at this point in time that [Ramirez] was in trouble." (Doc. 96 at 119.) Detective Slaughter's expansion of the scope of the search proves unwarranted as no evidence suggested that Ramirez would be found in room 225.

Detective Slaughter unreasonably entered rooms 225 and 227 as Detective Slaughter either failed to knock and announce or failed to announce himself as law enforcement. And, again, no facts support the conclusion that Ramirez was in immediate need of protection. The emergency aid exception fails to render reasonable the warrantless searches of rooms 225 and 227. *See Snipe*, 515 F.3d at 953.

## 2. Exigent Circumstances Exception

An officer may invoke the exigent circumstances exception when there exists both "probable cause to search" and "exigent circumstances sufficient to justify law enforcement officers to forego obtaining a warrant." *United States v. Brooks*, 367 F.3d 1128, 1133 (9th Cir. 2004) (citing *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002); *United States v. Johnson*, 256 F.3d 895, 905 (9th Cir. 2001) (en banc)). Exigent circumstances exist to prevent the frustration of legitimate efforts of law enforcement, *Mincey*, 437 U.S. at 393-94, to prevent the imminent destruction of evidence, *Ker v. California*, 374 U.S. 23, 40 (1963), to prevent harm to law enforcement or others, *Brigham City*, 547 U.S. at 403, or to prevent the escape of a suspect, *United States v. Santana*, 427 U.S. 38, 42 (1976).

The probable cause analysis "involve[s] a close scrutiny of the facts supporting a law officer's belief that evidence of crime can be found in the place of search." *Brooks*, 367 F.3d at 1133. Probable cause represents "a practical, nontechnical conception." *Brinegar v. United States*, 338 U.S. 160, 176 (1949). Probable cause seeks to balance the need to "safeguard citizens from rash and unreasonable interferences" with the need to provide officers "fair leeway for enforcing the law in the community's protection." *Id.* "[P]robable cause exists when there is 'a fair probability or substantial chance of criminal activity.'" *Brooks*, 367 F.3d at 1133-34 (quoting *United States v. Alaimalo*, 313 F.3d 1188,

1193 (9th Cir. 2002)). "[P]robable cause does not require a certainty . . . that criminal activity took place." *Brooks*, 367 F.3d at 1134. The Court examines the totality of the circumstances "known to the officer to determine whether probable cause existed." *Id.*

The Ninth Circuit determined in *Brooks* that exigent circumstances justified the officer's warrantless entry into room 301 at the Extended Stay in Lake Forest, California. 367 F.3d at 1130, 1136-37. The officer in *Brooks* received a 911 call from a hotel guest at the Extended Stay. 367 F.3d at 1130. The neighboring hotel guest "reported hearing what she thought were sounds of a woman being beaten in room # 301." *Brooks*, 367 F.3d at 1130. Guy Brooks and Sharon Bengis had been residing for the past three weeks in room 301. *Id.*

The officer arrived at the Extended Stay and met with the reporting guest. *Id.* The officer proceeded to knock on room 301's door and announced himself as law enforcement. *Id.* The officer "heard Brooks say, 'Honey, I think somebody is here.'" *Id.* The officer explained that he had "received an emergency call about a domestic disturbance." *Id.* Brooks responded: "I knew you were coming. She was very loud." *Id.* The officer observed that the room was in "total disarray." *Id.* Brooks informed the officer that Bengis was "in the bathroom, probably taking a shower." *Id.* The officer requested to speak to Bengis. *Id.* The officer entered the room without consent. *Id.* The officer heard Bengis crying in the bathroom. *Id.* at

1131. Bengis eventually exited the bathroom. *Id.* The officer observed no signs that Bengis had been physically assaulted. *Id.*

Brooks admitted that marijuana could be found in the dresser. *Id.* Brooks consented to the officer's search of the dresser. *Id.* Brooks further admitted that he had absconded from parole in Oregon. *Id.* The officer ultimately arrested Brooks. *Id.*

The Ninth Circuit reasoned that the officer possessed probable cause to enter room 301. *Id.* at 1134. The officer "had been alerted to the possibility that a woman in Brooks's room was being beaten, a serious danger; the hotel guest staying in the adjacent room had perceived an emergency and called 911 because she was alarmed by what she had overheard." *Id.* The officer also met with the reporting guest in the lobby and assessed her credibility. *Id.*

The officer likewise corroborated, in part, the information that the guest had provided in her 911 call. *Id.* For instance, Brooks implicitly confirmed that there was a woman inside room 301. *Id.* Brooks further confirmed that, at the very least, there had been a loud argument between him and Bengis. *Id.* The officer was unable to interact with Bengis, however, to assure her safety. *Id.* The Ninth Circuit concluded that the officer possessed probable cause to enter room 301 as there existed "a fair probability or substantial chance that an assault had occurred" based on the total circumstances. *Id.* (internal quotations and citation omitted).

The 911 call and subsequent investigation in the case at bar differs materially from the 911 call and subsequent investigation in *Brooks*. The GFPD had been alerted that there was a possibility that sex trafficking was occurring at the Extended Stay in room 227. (Doc. 93.) Sadowsky and Arnold never reported to 911 that the perceived sex trafficking, albeit a serious danger, warranted an emergent response. *See id*. Rather, Arnold requested that an officer be dispatched to the hotel as she wished to make a report of "suspicious activity." *Id*.

Sadowsky supplied information to the GFPD dispatcher to support his own conclusion that sex trafficking was occurring at the Extended Stay. *Id*. Detective Slaughter, like the officer in *Brooks*, contacted Sadowsky before entering room 227. (Doc. 96 at 101.) Detective Slaughter presumably had the ability to assess Sadowsky's credibility as a reporting witness.

Sadowsky undermined his credibility while being cross-examined during the January 23, 2019, hearing. Sadowsky testified that the guests at issue in this case "look[ed] like they were drug dealers, druggies." *Id.* at 66. Sadowsky relayed his concerns of potential drug trafficking and potential human trafficking to the 911 dispatcher. (Doc. 93.) The 911 dispatcher independently highlighted potential sex trafficking, to the exclusion of potential drug tracking, in her dispatch notes that were made available to Sergeant Labard. (Doc. 95 at 3.)

Sadowsky testified that he sees all types of your average guest—the average business guest, the average traveler, and the average "person that comes into [the Extended Stay] and sells and pushes methamphetamine out of there." (Doc. 96 at 66.) Sadowsky exclaimed that he is "sick of" guests coming into the hotel and pushing methamphetamine and that he was "done with it." *Id.* Sadowsky stated that with the increase in guests at the hotel distributing methamphetamine that the hotel staff "do[es] watch people." *Id.* Sadowsky's well developed animus towards guests who look like "druggies" casts doubt as to whether Detective Slaughter amply assessed Sadowsky's credibility regarding reports of potential sex trafficking.

Detective Slaughter, unlike the officer in *Brooks*, failed to corroborate sufficiently the information that Sadowsky had reported in his 911 call. GFPD was able to corroborate only the existence of the Cadillac that was connected with rooms 225 and 227 before Detective Slaughter entered room 227. (Doc. 96 at 111-12.) Officer Steven Scheer and Detective Scott surveyed the parking lot at the Extended Stay at approximately 11:36 a.m. on March 2, 2018. (Doc. 80-4 at 1.) Officer Scheer observed that a white Cadillac with plate numbers matching those that Sadowsky had provided the dispatcher was located in the Extended Stay parking lot. *Id*. Approximately fifteen to twenty minutes later, while Detective

Slaughter was investigating rooms 225 and 227, Officer Scheer observed a white Nissan Altima with California license plates park next to the Cadillac. *Id.*

Detective Slaughter could not corroborate whether Ramirez was undressed under the comforter. Detective Slaughter could not corroborate whether Ramirez was a minor. Ramirez's unnoticed absence from room 227, despite apparent surveillance by the GFPD and the Extended Stay staff, and her subsequent return to room 227, contradicted Sadowsky's report that Ramirez's never came in-and-out of the Extended Stay. (Docs. 93, 96 at 118.) Centeno answered Detective Slaughter's knock on room 225's door. (Doc. 96 at 117.) Detective Slaughter never testified to having heard any sounds or evidence that would otherwise support that another person could be found in room 225. *See* (Doc. 96 at 116.) This omission conflicted with Sadowsky's report that the occupant of room 225 was possibly trafficking the occupant of room 227. *See* (Doc. 93.)

Sadowsky's motivation for reporting the "suspicious activity" related to Laird's stay seems clear—Sadowsky sought to eradicate "druggies" from the Extended Stay. *See* (Doc. 96 at 66.) Sadowsky's mission resulted in the over-emphasis of certain facts. For instance, Sadowsky guessed that Ramirez was unclothed under the comforter despite admitting in his testimony that he couldn't tell. (Docs. 93, 96 at 15.) He reported that no personal items could be found in the room despite his admission that he could not see areas that a guest could store

personal items, such as in the closet, the bathroom, or the dresser. (Docs. 93, 96 at 16, 41.) Sadowsky reported that he believed Ramirez was contacting the male in room 225. (Doc. 93.) Sadowsky admitted in his testimony that he based his belief on pure speculation. (Doc. 96 at 62.) He reported that he worried about "some kind of violent thing going on" as the guests were from California. (Doc. 93.) Sadowsky admitted to having this worry despite his admission in his testimony of there having been no reports of violence related to rooms 225 or 227. (Doc. 96 at 30.) And, Sadowsky claimed that he had seen no one coming in or going out of room 227 despite the fact that Ramirez managed to leave after Sadowsky checked the smoke detector. (Docs. 93, 95 at 2.)  The over emphasis of these facts would lead law enforcement unreasonably to reach one conclusion—that sex trafficking likely was occurring at the Extended Stay on March 2, 2018.

Detective Slaughter's failure to assess adequately Sadowsky's credibility highlights the unreasonableness of Detective Slaughter's suspicions of sex trafficking. Law enforcement officers' failure to corroborate sufficient details of Sadowsky's report likewise undermines the reasonableness of entering rooms 225 and 227 absent a warrant. The totality of circumstances fails to support that there existed a "fair probability or substantial chance" that sex trafficking was occurring in rooms 225 and 227. *Brooks*, 367 F.3d at 1133-34 (citation omitted). Detective Slaughter did not possess probable cause to enter rooms 225 and 227.

Even if the Court had determined that Detective Slaughter possessed probable cause to search rooms 225 and 227, no exigent circumstances existed to justify Detective Slaughter's decision "to forego obtaining a warrant." *Brooks*, 367 F.3d at 1133 (citations omitted). The Government contends that "[a]s in *Brooks*, the officers here were objectively reasonable in believing that Ramirez might be in danger and entry into the hotel rooms might be necessary to come to her aid." (Doc. 94 at 23.) The Supreme Court has recognized that exigent circumstances exist to prevent harm to law enforcement or others. *Brigham City*, 547 U.S. at 403.

The Court concluded that the record failed to establish that Ramirez proved in need of protection or had been in immediate harm in its emergency aid analysis detailed above. The Court again concludes that the circumstances fail to support the contention that law enforcement needed to enter rooms 225 and 227, without first obtaining a warrant, to prevent harm to Ramirez. Exigent circumstances do not justify the warrantless searches of rooms 225 and 227.

### B.     Ramirez's Arrest and Decision to Impound Her Vehicle

Ramirez further contends that law enforcement arrested her without probable cause and that law enforcement possessed no legal basis to impound Ramirez's vehicle while Detective Slaughter sought to obtain a search warrant. (Doc. 80 at 8, 10.) The Court's determination that the warrantless searches of rooms 225 and 227 proved per se unreasonable negates the need to address fully Ramirez's alternate

grounds for suppression. The subsequent arrest of Ramirez and impoundment of her vehicle were based on the warrantless searches of rooms 225 and 227. And, as such, law enforcement possessed no legal basis to arrest Ramirez or impound her vehicle.

## C.    Exclusionary Rule

Law enforcement's initial searches of rooms 225 and 227 prove per se unreasonable as neither the emergency aid exception or the exigent circumstances exception justified the officers' warrantless entry into both rooms. Ramirez's arrest and law enforcement's impoundment of her vehicle based on the warrantless searches of 225 and 227 equally proves unconstitutional.

Evidence obtained that proves derived from an illegal search constitutes "fruit of the poisonous tree" and must be excluded. *Nardone v. United States*, 308 U.S. 338, 341 (1939). "[E]vidence seized during an unlawful search [cannot] constitute proof against the victim of the search." *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) (citing *Weeks v. United States*, 232 U.S. 383 (1914)). The exclusionary rule "extends as well to the indirect as the direct products of such invasions." *Wong Sun*, 371 U.S. at 485 (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920)). The Court must determine "whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means

28

sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488 (citation omitted).

When the affidavit for a search warrant contains evidence illegally obtained, the Court will purge the tainted evidence before it examines "whether the remaining facts still afforded a substantial basis for concluding that the search warrant was supported by probable cause." *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001). The affidavits for the search warrants for rooms 225 and 227, the Cadillac, and the Nissan contained evidence derived from the unreasonable warrantless searches of rooms 225 and 227. *See* (Docs. 94-1, 94-2, 94-3, 94-4.) The affidavits included law enforcement's observations of cell phones and cash in room 227 and their observations of guns in room 225. (Docs. 94-1 at 3-4, 94-2 at 3-4, 94-3 at 3-4, 94-4 at 3-4.) The affidavits included Centeno's criminal history. (Docs. 94-1 at 4, 94-2 at 4, 94-3 at 4, 94-4 at 4.) The affidavits further included the fact that Ramirez provided Detective Slaughter with two differing forms of identification. (Doc. 94-1 at 4-5, 94-2 at 4-5, 94-3 at 4-5, 94-4 at 4-5.) The exclusion of the tainted evidence results in the affidavit including Detective Slaughter's conversations with Sadowsky and Sadowsky's 911 call, Detective Slaughter's experience investigating trafficking based offenses, and information from a confidential informant that relates to drug dealing and the white Cadillac associated with rooms 225 and 227. *See* (Docs. 94-1, 94-2, 94-3, 94-4.)

The Court concluded above that Detective Slaughter's conversations with Sadowsky and Sadowsky's 911 call alone fail to support probable cause for the warrantless entry of rooms 225 and 227. Those facts alone likewise fail to support probable cause for the four search warrants at issue in the present case. The information supplied from the confidential informant, though significant, relates exclusively to potential drug trafficking—a crime that was deduced, in large part, from the evidence observed in plain view subsequent to the warrantless entry of rooms 225 and 227. *See* (Docs. 94-1, 94-2, 94-3, 94-4.) Detective Slaughter's experience likewise relates to the conclusion that possible drug trafficking occurred at the Extended Stay—a conclusion that proves supported by the evidence observed in rooms 225 and 227. *See id*. The evidence seized subsequent to the searches of rooms 225 and 227, the Cadillac, and the Nissan must be suppressed as fruit of the poisonous tree. Centeno's statements made to Agent Kinsey similarly must be suppressed.

## II.     Motion to Sever

Ramirez requests that the Court sever her case from her codefendant Centeno's case as the post-arrest statements made by Centeno will incriminate Ramirez. (Doc. 83 at 2.) Ramirez argues that she will be prejudiced by Centeno's statements as the use of Centeno's statements effectively will deny Ramirez her Sixth Amendment right to confront witnesses. *Id*. The Government represents that

it does not intend to introduce Centeno's incriminating statements regarding Ramirez's conduct in this case. (Doc. 92 at 2.) The Government proposes that redacting Centeno's statements and limiting the interviewing agent's testimony regarding his interview of Centeno would cure Ramirez's argued prejudice. *Id.*

Federal Rule of Criminal Procedure 8(b) provides that the indictment "may charge two or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." The federal system prefers "joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). "[J]oint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987).

Federal Rule of Criminal Procedure 14 recognizes, however, that proper joinder pursuant to Rule 8(b) may prejudice either party. *Zafiro*, 506 U.S. at 538. Rule 14 provides as follows: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14. "[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540 (internal citations omitted). The Court "should grant a severance under Rule 14

only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

The introduction of a codefendant's "incriminating extrajudicial statements" during a joint trial violates a defendant's "right to cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Bruton v. United States*, 391 U.S. 123, 126 (1968). The *Bruton* rule does not require, however "that all extrajudicial statements or confessions not be used in a joint trial." *United States v. Yarbrough*, 852 F.2d 1522, 1537 (9th Cir. 1988). *Bruton* requires exclusion only of "those statements that clearly inculpate the defendant or are powerfully incriminating." *Id.* (internal quotations and citations omitted). Redaction of a codefendant's statements alleviates *Bruton* concerns. *See Richardson*, 481 U.S. at 211 ("We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to her existence.")

Agent Kinsey questioned Centeno at the Extended Stay following the warrantless searches of rooms 225 and 227. (Doc. 80-3 at 3.) The Court has suppressed Centeno's statements as they constitute fruit of the poisonous tree. The Government's proposition to redact Centeno's statements, nonetheless, would have

remedied any prejudice Ramirez faced. *See Richardson*, 481 U.S. at 211. Setting aside Centeno's post-arrest statements, Ramirez presents no further evidence that the joinder of her case to Centeno's would compromise a specific trial right of Ramirez's, or that it would "prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. Ramirez has failed to establish that she stands prejudiced by the joinder of her and Centeno as codefendants. Severance of Ramirez's case from Centeno's proves unwarranted under these circumstances. *See* Fed. R. Crim. P. 14.

## ORDER

Accordingly, IT IS ORDERED:

1. Ramirez's Motion to Suppress (Doc. 79) is GRANTED.

2. Ramirez's Motion to Sever (Doc. 82) is DENIED.

3. Centeno's Motion to Suppress (Doc. 86) is GRANTED.

DATED this 29th day of March, 2019.

Brian Morris
United States District Court Judge